We call the next case for argument this morning, C. G. by and through her friend Keith and Linda G. v. Waller Independent School District. We hear first from Mr. Mark Whitburn and then Mr. Christopher Barreca. Thank you, Your Honor. May it please the court. Plaintiff is currently nine years old. She's a disabled child with autism who received special education services from the age of three to the age of five at Waller Independent School District. In May of 2011, Waller Independent School District evaluators performed a full individual evaluation and witnessed plaintiff signing full sentences and showing significant versatility with signing. In fact, at that time, plaintiff had command of at least 300 signs. She had made progress with the help of Applied Behavioral Analysis, or ABA, clinics up to that point. In May of 2012, recognizing the significance of Applied Behavioral Analysis to plaintiff's success, Plaintiff's ORG Committee at Waller ISD placed ABA in plaintiff's Individualized Education Program, or her IEP, as a required strategy for use of plaintiff in the upcoming 2012 to 2013 school year. ABA is a research-based methodology which requires careful data gathering to determine an individual's current status with respect to a desired behavior or skill, incremental step-by-step movement towards the desired goal with reinforcement of each positive behavior  and then continued data gathering to determine if the educator should adjust the approach at all along the way. Plaintiff's IEP consequently expressly required data charting to assist in this regard. The ORG Committee also in May of 2012 recognized that Waller ISD staff needed to encourage plaintiff's verbalizations and sign language. In the actual 2012 to 2013 school year, the instructional staff working with plaintiff had no awareness of plaintiff's IEP at the beginning at all and effectively ignored it once they did have such awareness. Far from using ABA principles, they reinforced negative behaviors instead of positive ones. They either collected no data or they collected data in such an unreliable manner that it proved useless to anyone, including themselves. They did not encourage either verbalization or signing from plaintiff. In fact, they placed her in a highly restrictive zone classroom, which limited space to move around, limited interactions with other children, limited any speech or other forms of communication, despite the fact that everybody recognized that this was a child, this individual child, was somebody who needed immersion speech and needed, as the IEP itself said, encouragement of speech and signing. In fact, in this highly restrictive zone classroom, Waller ISD used largely silent instruction in the zone classroom and only permitted speech at one particular one-on-one table. Would you explain what these zonings amounted to? I mean, she, the child, would go to a particular zone in the classroom? That's right, Your Honor. The classroom was divided up by wall barriers into individual zones, and the wall barriers were designed to limit the space in the classroom that any individual child had and to limit any exposure to interactions with any other children in the classroom. When you're in that zone, you're in there by yourself. Now, you may really be in there by yourself because you may be doing independent work. It was a solitary zone, huh? It can be solitary with respect to other children. Now, you might have a teacher in there doing work with you, but you're not in there with some other classmate. You're not getting group instruction or having any opportunity to interact with other children there. Waller ISD placed all of its disabled students receiving special education services in these zoned classrooms, all of them, all the way up from the elementary school to the senior high school. So the room was full of these sort of cubicle zone areas, but it was all disabled students. There were no non-disabled students in this classroom of zones. That's exactly right, Your Honor, exactly right. In fact, not only were there no non-disabled or typically developing peers in these zoned classrooms or in any given zoned classroom, but the system was designed to restrict any interactions with such typically developing peers to lunch or recess, and even those areas, the idea of the zoned classroom was to restrict that kind of time as much as possible and to maximize the time in these zones. All of these disabled students who were receiving special education services, they were all placed in these zoned classrooms without any regard to their identity. Let me ask you this because I'm trying to figure out sort of procedurally, this whole area of the IDEA Act is very stylized. You have the need to have these meetings. You have an IEP. You have all of these kind of stylized ways of approaching things, and I think so that school districts will have some framework to address this, which I appreciate. So within this framework, it's not really enough to just say, well, this one teacher was incompetent or this other person didn't know about the IEP or this person didn't use the right technique. We have to relate that to a framework. So first of all, was the IEP deficient, and if so, in what way? The May 2012 IEP itself is probably not deficient. There's some evidence that the goals were not particularly measurable and this sort of thing, but that's not really the claim that we're making. That's not really the issue that we're bringing to this court with respect to the defendant's failures under the IDEA. The issue that we're bringing to the court is with respect to whether the IEP was satisfactory. It wasn't implemented. It's not enough under the IDEA just to develop an IEP that works. You can't develop it and then just sort of shove it into a basket where nobody ever sees it. Okay, walk me through the procedure of that. So let's say, let's assume arguendo the IEP is fine, but that there's problems with implementation of it. Then what is the right procedure for you to follow to address that? Because I'm feeling like this seems very big, the statements that you're making, and this process is very step-by-step. The school gets the opportunity to get it right because we're dealing with school districts that are dealing with thousands of children, oftentimes maybe not this particular one, many of whom do not have these needs, some of whom do, and everybody needs kind of a fair chance. So we have this system. Tell me specifically now, we have an IEP, assume arguendo it's decent. It's not being followed by Teacher A. What are you all, your clients as parents, supposed to do, and what is the school district supposed to do that didn't happen here? Well, I think that it is, the first flaw in procedurally as far as what happened is that it goes without saying that if you have a program, you have to follow it. It's not just sort of a minor disconnect. Okay, specifically what in the IEP was not followed? Okay, so the IEP, and these are just a few examples, the IEP called for the, specifically for plaintiff, there was supposed to be positive reinforcement. There was supposed to be use of ABA principles and methodology. There was supposed to be gathering data. There was supposed to be behavioral charting. There was supposed to be immersion and encouragement in speech and sign language. There was supposed to be staff-to-student ratios that varied based on plaintiff's needs. It's not only that these things weren't followed. The instructional staff working with plaintiff didn't even know. Okay, so now the parents realized this at some point. Then what? What did they do and what did the school district do or fail to do? Well, I don't think that the plaintiff's parents ever completely realized that the instructional staff didn't even have awareness of the IEP. You have to understand that when you're dealing with the plaintiffs of a disabled child like this, they're not experts in the system either. Oh, and don't misunderstand me to try to be blaming the parents. What I'm trying to get to, look, I understand as a parent, what you would want is the very best for your kid. You would want just perfection. You would want everything under the sun, and you would do everything in your power to give your kid everything. And I don't doubt these parents fall in that category. This isn't negative to them. But the IDEA understands that school districts are not going to be avenues of perfection, and it's setting up a standard, and it's setting up a process. Because if the IEP isn't being followed, then something has to bring that to attention of the school district so they can solve that. That's where I'm trying to go. I'm not trying to blame the parents. Because I have seen cases where I completely understood what the parents did, but they acted precipitously under the law and weren't able to do anything on their behalf because the law didn't allow that. That's where I'm trying to go with this. I understood, Your Honor, and I think the IDEA statutory framework puts the burden on the school district to follow its own program. That's what it's there for. You've got a program. You're working with the parents to develop it. If you shove it to the side and don't follow it at all, then you're not doing anything that you're supposed to be doing. But if you shove it to the side and don't follow it at all, does that allow the parents to then take the child to a private school and get reimbursed, or is there some other in between? Now, I'm going to ask your opponent these same questions, so I want your answer. Sure. I don't think that that by itself necessarily allows the parents to say. For example, we're starting in September of 2012. The instructional staff wasn't following it. If the parents had come to the October 2012 org meeting and they said, Aha, gotcha, you didn't do X, Y, and Z in the IEP. We're yanking the child out. You have committed a procedural fallacy. We're gone. No, I don't think the IDEA does permit that, because you can't have actionable violations that are purely procedural. So it is plaintiff's burden to show that these kinds of difficulties that in implementing the IEP had consequences, that there were substantive consequences over the course of the year that redounded to plaintiff's lack of benefit and that prevented her from receiving a free and appropriate public education. That's standard. If I just sit up here and say, Well, they didn't follow the IEP, and I leave it at that, then no, I'm gone. Okay, so that's what I'm trying to understand. I'm trying to get more understanding of the facts here and how they relate to this framework. Sure. She regressed. She regressed because of these failures in the IEP. But does the school get a chance to try to fix this, or do you get to say, Look, you didn't follow the IEP. My child regressed. I'm out of here, and you're paying for it. Maybe I'm just not being clear, because I don't feel like I'm getting the answer to this very core thing that I'm trying to understand. Okay, then let me try to attack it a different way, and you tell me if I'm getting it right. So the parents called in October 2012. They said, Our child's regressing. They said, We're seeing problems here. Can we see the data? Can we see the data that you're supposed to be collecting under the IEP? And the district said, No. She's doing all right. We don't have data to show this. We can't give you anything. But as far as we're concerned, she's doing fine. Still problems. November 2012. The parents call another ARDNY. She's regressing further. She can't do any signing. She's losing her verbalization. She's regressing in terms of behavior. The parents are again saying, Look, here we are. Tell us what's going on. What is being done to move our child forward based on the program that we supposedly worked on together? Wow, we don't have any data. As far as we're concerned, she's doing fine. And, oh, by the way, we should cut the day down a little bit because although we say she's doing fine, she maybe can't handle a full day. The parents at that point say, Well, let's find out what's going on with this behavior. Give us a functional behavioral assessment so we can understand better. The school district reluctantly says, Yeah, okay, we'll give you a functional behavioral assessment. But they don't get it done until February of 2013. The parents don't get it in April of 2013, almost at the end of the year. And even when the school instructional staff becomes aware of it and becomes aware that the school district's own licensed school psychologist has agreed with an independent expert who went in there and looked at the classroom that the classroom isn't functioning properly, the instructional staff still ignores it all the way through the end of the year. And by the end of the year, plaintiff has regressed to a point where by the school district's own testing she can't do spontaneous verbal requests. She may only have 12 signs left out of the 300 she had before. She's regressed. Her behavior is to a point where she's grunting and screaming and carrying on. She's not communicating at all. Why? Because behavior is the only form of communication that she has left. The school district can't understand her signs, isn't encouraging them, has squelched her verbalization in a highly zoned classroom designed for that purpose, and here she is. How is she going to get through to anybody? Well, she's going to grunt, she's going to scream, because that's all she's got. What's her current situation? Her current situation is great, because she's been in private placement. Once she got out of Waller ISD in 2013, she went to people who actually evaluated her according to her own individual characteristics, placed her in natural environment training, and immediately were able to get a great amount of response from her. She recovered her own signs and learned many, many more, began to verbalize again. It was only after she got out of Waller ISD and with people who were actually willing to work with her individual characteristics that she began to show that explosion of activity. There was nothing about her particular state in that year that was responsible for the catastrophic decline. Rather, it was what she was dealing with, with Waller ISD. I'm sorry. I should have informed you your time has expired, but you have five minutes on the vote. Thank you, Your Honor. Mr. Borreca. Thank you, Your Honor. May it please the Court, my name is Chris Borreca. I represent Waller ISD. I'm accompanied here by my co-counsel, Holly McIntosh. If the facts were even remotely close to what my opposing counsel depicted for you, I would probably agree with you that we have failed under the test developed by this Court over 20 years ago, which has served as an excellent guide to school districts in terms of determining what their obligations are under the Michael F. v. Cy Fair case. I would agree with you. The facts are not even closely to that. Let me give you one example. Counsel says that the child had regressed in her sign language ability towards the end of the relevant school year, and the relevant school year, Your Honor, because of our one-year statute of limitations in Texas, is 2012 to 2013, beginning in August of 12. The father at 4790 and at record site 4791 states unequivocally that the child had 300 signs in May of 2013. Now, I will be the first to state that the school staff never saw the child using 300 signs spontaneously, but there is nothing in the record whatsoever to indicate that the child ever had this spontaneous and generalized ability to sign in that fashion. Counsel stated that the IEP had not been followed, but acknowledged that the IEP offered in 2012, beginning in 2012, was appropriate. In fact, the court, district court, and the hearing officer, in an over 50-page opinion, very detailed opinion, dealing with the facts generated and the record generated in an eight-day-long trial, determined that the IEP for 2012 was appropriate, it was designed in accordance with the evaluation information that the school district had access to, and in fact provided a benefit to the child. But was it followed? It was followed, Your Honor. But supposedly all these people didn't even know about it. How can they follow something they don't know about? At record site 4856, and... Pardon me. First time before this court. Must be beginner's nervousness. At record site 4856, Karen Wynn, the teacher, states unequivocally and without challenge that she was aware of the child's IEP, had the child's IEP prior to the beginning of the school year. What counsel is, and I'm assuming this, I don't know it for a fact, what counsel may be alluding to is an email chain from the principal of the school to the special education coordinator, Ms. Mordecai, writing to Ms. Keithley, stating that she, the principal, doesn't know where the IEP is, because the principal at that school always had a duplicate copy, apparently, of the IEP, but the implementers of the IEP, Ms. McCabe, Ms. Wynn, Ms. McCabe is the speech therapist, had the IEP, in fact were providing the program, the only citation in the record that indicates the program wasn't being provided was the first week of the school time period when the speech therapist believed inadvertently that she did not need to provide services during that first week time period. That was corrected by Ms. Otis, the special education director, and compensatory time was provided. If I can address, just briefly, the statement regarding the zoned classroom, because I think that's an area that has been also mischaracterized. The testimony from Laura Rosen was found to have been particularly persuasive to the hearing officer in the case below. Ms. Rosen was a trained individual working with autistic students for over 45 years. She was brought in by the special education director early in the year, by September 25th. She was providing over... She was in the classroom for six hours each week beginning at that time, restructuring it for the individual needs of the student herself. The student in the zoned classroom was not isolated, as was depicted by opposing counsel, but there are numerous record citations from Ms. Rosen's testimony and from Ms. Otis's testimony regarding group time, circle time. In fact, the speech therapist, once a week, would provide 30 minutes of group speech therapy to the student in question. This zoning was designed to minimize the student's inability to focus her attention. Many of the students in the same classroom and just to also turn some attention, the classroom itself is a preschool program for children with disabilities. That's what PPCD means. It is a program designed for children with disabilities and the state of Texas incorporates the PPCD program to provide services for students who are younger than the compulsory age of attendance. There are no students of the exact same age in school, in any school in the state of Texas, unless they are in a pre-K program and the pre-K standards are dealing mainly with poverty and with English as a second language, neither of which this student qualified for and was not able to participate. So you're saying there was no one to mainstream her with? No, not at all, Your Honor. She was mainstreamed with students of similar age and then towards the end of the year she was that age. She turned five in October, so she wasn't eligible for kindergarten that year, 2012, but she did turn five, so she was able shortly after entering the school to be integrated in numerous ways, at lunchtime, in the hallways, at recess. In fact, there are pictures of the student in the record enjoying recess. Excuse me. And she also, under the testimony of Karen Wynn, enjoyed an over-hour-long program with, it was a graduation ceremony for kindergarten students. She attended, along with other students in the PBCD classroom, and Ms. Wynn testified in what I consider to be in a particularly dramatic fashion how proud she was of her student because she was able to sit, to enjoy, to pay attention, and to not disrupt. There was talk about disruptive behavior. Primarily, the disruptive behavior, the aggressive behavior that was referred to, occurred either during the previous school year or early in the school year. It diminished to the point where when the school district said, okay, we will provide a functional behavioral assessment, we'll look at doing a bit, the teacher and Dr. Goldstone both had to sort of scratch their heads saying, what are we going to address? They finally came up with addressing whining as a behavior, and that's the same behavior that the independent evaluator, Dr. Adami, who performed an independent educational evaluation for the student, that's exactly what Dr. Adami came up with. How are we supposed to assess? I mean, we weren't there. How are we supposed to assess what sound like very contradictory stories of the same year? You're telling this story where this child is doing fine, integrated with other students, getting all this specialized help, signing, speaking, sitting through graduation. Your opponent is talking about someone who starts the year pretty good, ends up by the end of the year grunting and screaming and kicking and highly regressing. How do we evaluate that? Because these are sort of the tale of two children, but it's the same child. Pardon me, were you finished, Your Honor? Yes, so I'm trying to get your answer. The way in which I think this court assesses it is in accordance with the established case law in this jurisdiction and in most jurisdictions, and that is that a finding by the hearing officer who has had the opportunity to sit through testimony, to observe witnesses, to read through the documentation in great detail, and in this particular case, having been physically present myself, along with my opposing counsel, I can assure you it was a lengthy hearing. The findings of educational benefit are reviewed under a clear error standard, and I apologize as being a participant in this that you have the record before you, which is so voluminous, but that is just simply the amount of testimony. We had eight days of testimony along with corresponding record sites. In the due process hearing decision issued by Hearing Officer Carmichael, the details are provided for each of these issues where the facts do not bear out what has been presented to you in the briefing, frankly. And the district did not have an opportunity to provide a rebuttal to the reply, but there are several statements there which, I'm trying to be generous here, are either misstatements or mischaracterizations or misunderstandings of what transpired, starting with, for instance, with my first example of the IEP being provided to the staff. The documentation itself doesn't prove that. They were six-week progress reports. There was a detailed plus-minus checklist developed for each of the objectives for the child, which Ms. Wynn prepared and testified to during the course of the hearing. These six-week progress reports were provided to the parents every six weeks, detailing the level of achievement for the student. The disagreement came in when the parents said, we want it presented in the same format as our private ABA therapist, but they never told the school district what that format was. And the court will see documentation from the school district where the school district provided samples of charting to the parents, saying, would you like it in this format, would you like it in that format? In fact, it became a discussion point at the May 2013 ARD meeting. That became an issue of contention as to how the data was to be tracked, but there is no standard, there is no requirement that data be kept in any particular format, and that is a finding that the hearing officer found in conformance with current case law. The Apostle Robles case out of California talks about data being presented to that court in the format of statements, simple statements about how the child was performing. So I think the answer, long-winded as it is, to your question, is the findings of fact regarding educational benefit as provided by the district court, as provided in great detail by the due process hearing officer, are to be reviewed by this court under a clear air of standards. And only after a review of the entire record, if there was some feeling that there would be a manifest injustice, that is my understanding of what clear air means, would this court be in a position to disturb those findings. There was discussion at the hearing, a great amount of discussion, about the extended school year services. There were two opportunities for extended school year. The first occurred in a one-to-one setting where the child was with her then current teacher during the summer of 2012. That teacher met the parent each and every day, presented the parent with information. This same teacher was described by the mother as someone who should be running for president. She felt so wonderful about that particular individual. We provided that program for approximately 54 hours during the school year. The next offer of extended year services... During the school year or during the summer? Oh, excuse me, during the summer. I apologize. It was just during the summertime. But it was designed specifically for the child such that it didn't allow any large gaps of time to occur between sessions with the teacher. The next offer increased that amount. The next time extended year services was offered at the May ARD meeting, it was offered with an increase of 40% for approximately 75 hours. The parent's lay advocate who attended the meeting stated that she thought it should be for a much longer time period but gave absolutely no substantiation in terms of evidence as to why that should be the case. The parent grew frustrated with the school district because in October the school district was being asked, what are you going to provide for extended year for the summer of 2013? The standards for extended year services in Texas under Texas law require evidence of a regression problem and a recoupment problem. The same teacher that provided the instruction during the summer program looked at the data collected by Ms. Wynn, the teacher, during the first six weeks and testified under oath that she felt the child had not regressed. In fact, if you look in the IEP itself, which is at Respondents 4, Exhibit 4 in the record, you will see that the document itself contains a threshold or a baseline of performance. It has the student's IEP from the previous year, what she achieved, what she hadn't. So Ms. Smith was in a particularly good position, even though Ms. Wynn had not even been hired. She was not employed during the previous year. Ms. Smith, who did testify, was in a particularly good position to testify regarding regression. There had not been documentation of regression, just like there had not been the year before, but the school district decided they were going to go ahead and provide an extended program. In fact, the school provided an extended day for their child. This child, again, was a preschool child. Most children who are in PPCD programs... Pardon me. Most students who are in PPCD programs in the state of Texas are there for a half a day. This child was there for the entire school day. We experienced some difficulties at the end of the school day, around 2 o'clock, during the October time period, and the school district, at the October meeting, in conjunction, not against the wishes, but in total agreement with the parents, reduced by 60 minutes that extended school day with the idea that we want school to be a happy place for this child, a productive place, and to minimize the students' own behaviors, which were growing exacerbated at the end of the school day. So the child was eventually moved back to a full day, beginning a full day, in the latter part of December, and then finally, by January, had achieved back to full-time status. Mr. Verrico, your time has evaporated. It has, Your Honor. Your Honor, thank you very much. I appreciate your tolerance for my voice. Thank you. Mr. Whitman. Thank you, Your Honor. Yes, I'm sorry about it. Just as a general matter in terms of any mischaracterization by Plaintiffs of the record,  and look at the record. I think, for example, with respect to But if we have a tale of two children, then wouldn't we defer to the hearing officer and the district court on resolving those disputes of fact? We're not in a position to assess those. I think you are in a position to assess them, and I think that deference in this case would be inappropriate for several reasons. In the first instance, neither the hearing officer nor the district court ever grappled with some of the key evidence in the case, which is, for example, that the district reinforced negative behaviors, that the district constantly was using high-level reinforcers for something to prevent certain kinds of behavior. Well, why were they doing that if there was no behavior being exhibited? It doesn't make any sense. In this case, I think you've got witnesses from the school district that obviously have an incentive to say that things were going well. You've got witnesses on the other side. So how do you look at it? Well, you have to look at it to a certain degree with just the logic of the situation. Why was the IEP developed in the way that it was? Why did the IEP call for ABA, reinforcing positive behaviors? Well, you reinforce positive behaviors under applied behavior analysis because you want to make sure that those positive behaviors continue. Well, what happens if you reinforce negative behaviors? And there's absolutely no testimony, there's no evidence in the record at all that plaintiff's account of that is wrong. Everybody says, all of the school district's witnesses themselves, even the director of special education, say that they were reinforcing these negative behaviors. Well, what happens if you do that? If you reinforce positive behaviors, you get positive behaviors back. If you reinforce negative behaviors, you get negative behaviors back. So what's the logical thing that would happen if you were actually engaging in an educational program that way? Well, you're going to get negative behaviors. And so when plaintiff's witnesses and plaintiff's evidence say that there were negative behaviors and the school district points to evidence that says, well, no, we don't really think there was, then you have to look at it with a certain modicum of logic. You're reinforcing negative behaviors, but all of a sudden magically the student, by herself, through her own intuitions, doesn't do those negative behaviors again, even though they're being reinforced? No, it doesn't work that way. Science doesn't work that way. And, in fact, the evidence in the case indicates that it didn't work that way here either because it's not only plaintiff's witnesses that talk about her having grunting and screaming and problems like that. In their own testimony, Ms. Wynn admits, Ms. Wynn, the well-rested teacher, admits that she was throwing tantrums. Why was she giving the Barbie? Well, she was giving the Barbie to calm her down. It was a calming down strategy. Calming down from what? From whining? No, calming down because she was having a tantrum. Calming down because she was exhibiting these negative behaviors. The plaintiff's account of the behavioral issue only makes sense. It's the only account that makes sense. With respect to the speech and language issue, if you're going to put a child in an environment in which she needs speech and language immersion, but you use silent instruction instead and you prevent her from access to speech and language immersion and nobody around knows signing, then is she really going to be having the same level of ability at the end? No. And the only thing that the defendant points to is a statement from her father that says she had 300 signs in May of 2013. Well, of course. What he's referring to is that she had 300 signs all the way along. They were there somewhere. They were latent. But by the time she got to May of 2013, they were only latent. She couldn't use them until she got out of Waller ISD, back into a private program, and they were able to draw them back out. Yeah, they were there. She had them. But she couldn't use them anymore. In fact, her private speech therapist testifies that she only had 12. And even if you look at the data of the speech therapist from Waller ISD, she's got goals that say, okay, well, she's supposed to have 25 signs. She's supposed to show 25 signs in the course of the year. She's supposed to have 12 verbalizations. Well, she can only list them one by one, and she lists them according to her own testimony any time she hears them. So over the whole course of the year, she's hearing just these 25 signs. Why are she seeing only just these 25 signs? Why? Because nobody's signing with her. She's supposed to have 300. Mr. Whitburn, your time has expired. Thank you. Thank you very much. We'll take this case under advisement.